## UNITED STATES  DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **BRADLEY L. LOWE** | * | |
| **Plaintiff** | | |
| | * | |
| **v.** | | **CIVIL ACTION** |
| | * | |
| | | **NO.: 1:06-cv-01803-ESH** |
| **DONALD C. WINTER** | * | |
| **Secretary of the Navy** | | |
| **Department of the Navy** | * | |
| **Defendant** | | |

\*     \*     \*

## DEFENDANT DEPARTMENT OF THE NAVY'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

Department of the Navy ("Navy"), through  undersigned counsel, hereby moves this Honorable Court to dismiss the complaint with prejudice against the Navy, pursuant to Rule 12(b)(1), and 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that this court lacks subject matter jurisdiction, and the complaint fails to state a claim.  In the alternative, Defendant moves for summary judgment for the Navy pursuant to Rule 56(c) of the Federal Rules of Civil Procedure in that there is no genuine issue as to any material fact alleged in Plaintiff's complaint, and the Navy is entitled to judgment as a matter of law, as more fully set forth in the memorandum of law attached hereto.

1

Respectfully submitted,


___/s/_____
JEFFREY A. TAYLOR
D.C. Bar No. 498610
United States Attorney


___/s/_____
RUDOLPH CONTRERAS
D.C. Bar No. 434122
Assistant United States Attorney


___/s/_____
CHARLOTTE A. ABEL
D.C. Bar No. 388582
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C. 20530
(202) 307-2332

Of Counsel:
LCDR Heidi K. Hupp, JAGC, USN
General Litigation Division
Office of the Judge Advocate General
1322 Patterson Avenue Suite 3000
Washington Navy Yard D.C. 20374-5066

## UNITED STATES  DISTRICT COURT
## DISTRICT OF COLUMBIA

**BRADLEY L. LOWE**                                        *
      **Plaintiff**

                                *

      **v.**                                        *                    **CIVIL ACTION**

                                *                    **NO.: 1:06-cv-01803-ESH**

**GORDON R. ENGLAND**                                *
**Secretary of the Navy**
**Department of the Navy**                            *
      **Defendant**

                         *    *    *

## DEFENDANT'S STATEMENT OF MATERIAL FACTS
## NOT IN DISPUTE

1.  On October 2, 2004, plaintiff was relieved from his command due to aircraft mishaps under his command.  Complaint ¶ 9.

2.  On October 18, 2004, the Marine Corps Times published a story titled, "Sacked in Iraq - Squadron CO, XO, 3 others sent packing - what went wrong?"  See Marine Corps Times article dated October 18, 2004; see Exhibit A.

3.  The article states that, "After the fifth accident in 11 months, the 3rd Marine Aircraft Wing commander had seen enough.  It was time to clean house.  In what could be called a 'decapitation strike', Maj. Gen. Keith J. Stalder fired both the commanding and executive officers of Marine Light Attack Helicopter Squadron 367."  Id.  The article further quoted Maj. Gen. Stalder from a written response to questions dated October 5, 2004 as saying, "'Making a decision like this one is very difficult, but serious measures need to be taken . . . When we lose aircraft and people in mishaps we are doing the work of the enemy.

The squadron has performed combat missions well, but the rate at which it was losing aircraft and personnel from mishaps is unacceptable.'" Id.

_____4.  The article listed plaintiff's name as the relieved Commanding Officer, but gave no other information about his individual performance, and went on to provide details gleaned from interviews with the plaintiff himself and with anonymous squadron members about the aircraft mishap record of HMLA 367.  Id.

_____5.  The only official comments made by Marine Corps officials about plaintiff were in the October 5, 2004 "written response to questions." Id.


                              Respectfully submitted,


                              ____/s/_____
                              JEFFREY A. TAYLOR
                              D.C. Bar No. 498610
                              United States Attorney


                              ___/s/_____
                              RUDOLPH CONTRERAS
                              D.C. Bar No. 434122
                              Assistant United States Attorney


                              __/s/_____
                              CHARLOTTE A. ABEL
                              D.C. Bar No. 388582
                              Assistant United States Attorney
                              555 Fourth St., N.W.
                              Washington, D.C. 20530
                              (202) 307-2332

2

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **BRADLEY L. LOWE** | * | |
| **Plaintiff** | | |
| | * | |
| **v.** | | **CIVIL ACTION** |
| | * | |
| | | **NO.: 1:06-cv-01803-ESH** |
| **GORDON R. ENGLAND** | * | |
| **Secretary of the Navy** | | |
| **Department of the Navy** | * | |
| **Defendant** | | |
| | * * * | |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Plaintiff, Bradley L. Lowe, on active duty in the United States Marine Corps, filed this action seeking monetary damages and attorney's fees against the Department of the Navy ("Navy") under 5 U.S.C. § 552a, the Privacy Act. In his complaint, plaintiff alleges that the Navy maintained records in a system of records within the meaning of the Privacy Act regarding plaintiff's relief from command of a helicopter unit and the circumstances surrounding his relief. Complaint ¶19. He further alleges that the Navy unlawfully released that information pertaining to plaintiff and protected by the Privacy Act to the Marine Corps Times, a private entity. Complaint ¶20.

As a result of this alleged unauthorized disclosure, plaintiff asserts that he suffered injury to his personal and professional reputations and claims monetary damages in an unspecified amount. Complaint ¶14, Prayer for Relief ¶(a). As more fully discussed below,

1

this Court lacks subject matter jurisdiction to hear plaintiff's claim under the Privacy Act because the two-year statute of limitations expired before plaintiff's complaint was filed. In the alternative, there is no genuine issue as to any material fact, entitling the Navy to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## STATEMENT OF FACTS

Plaintiff is an officer on active duty in the United States Marine Corps. The United States Marine Corps is a component of Defendant, Department of the Navy. On November 20, 2003, plaintiff assumed command of a Marine Corps squadron, Helicopter Marine Light Attack 367 (HMLA 367), 3rd Marine Aircraft Wing (3dMAW), I Marine Expeditionary Force (IMEF), Camp Pendleton, CA. On August 18, 2004, plaintiff's squadron deployed to Iraq for Operation Iraqi Freedom II. On October 2, 2004, plaintiff was relieved or removed from his command due to aircraft mishaps in his squadron. On October 18, 2004, the Marine Corps Times published a story titled, "Sacked in Iraq - Squadron CO, XO, 3 others sent packing - what went wrong?" See Marine Corps Times article dated October 18, 2004; see Exhibit A. The article states that, "After the fifth accident in 11 months, the 3rd Marine Aircraft Wing commander had seen enough. It was time to clean house. In what could be called a 'decapitation strike', Maj. Gen. Keith J. Stalder fired both the commanding and executive officers of Marine Light Attack Helicopter Squadron 367." Id. The article further quoted Maj. Gen. Stalder from a written response to questions dated October 5, 2004 as saying, "'Making a decision like

2

this one is very difficult, but serious measures need to be taken . . . When we lose aircraft and people in mishaps we are doing the work of the enemy.  The squadron has performed combat missions well, but the rate at which it was losing aircraft and personnel from mishaps is unacceptable.'"  Id.  The article listed plaintiff's name as the relieved Commanding Officer, but gave no other information about his individual performance, and went on to provide details gleaned from interviews with the plaintiff himself and with anonymous squadron members about the aircraft mishap record of HMLA 367.  Id.  The only official comments made by Marine Corps officials about plaintiff were in the October 5, 2004 "written response to questions."  Id.

## ARGUMENT

### I.    PLAINTIFF'S CLAIM IS BARRED BY THE STATUTE OF LIMITATIONS

#### A.    Applicable Legal Standard

Federal courts are courts of limited jurisdiction which may exercise only those powers authorized by Constitution and statute.  Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 377 (1994).  Therefore, "[i]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction."  Id. at 377 (citations omitted).  The first and fundamental question presented by every case brought to the federal courts is whether the court has jurisdiction to hear it.  Bender v. Williamsport Area School Dist., 475 U.S. 534, 541 (1986).  Sovereign immunity is a jurisdictional bar, and a waiver of sovereign immunity is to be

construed strictly and limited to its express terms.  See Department of the Army v. Blue

Fox, Inc., 525 U.S. 255, 261 (1999).  A waiver of sovereign immunity "cannot be implied

but must be unequivocally expressed."  United States v. King, 395 U.S. 1, 4 (1969).

### B.    The Court Lacks Subject Matter Jurisdiction to Hear Plaintiff's Claim Under the Privacy Act

In the instant case, the Complaint cites the Privacy Act, 5 U.S.C. §552a, as a basis

for jurisdiction.  Compl. at ¶2.  The primary purpose of the Privacy Act is to "provide

certain safeguards for an individual against an invasion of personal privacy."  Pub.L.93-

579 § 2 (Congressional Findings and Statement of Purpose) 120 Cong. Rec. 40400 (Dec.

17, 1974).  The Privacy Act prohibits agencies from "disclos[ing] any record which is

contained in a system of records by any means of communication to any person, or to

another agency, except pursuant to a written request, by, or with the prior written consent

of the individual to whom the record pertains..."  5 U.S.C. §552a(b).  The Act contains a

provision for damages that "represents a limited waiver of sovereign immunity."  Doe. V.

Chao, 306 F.3d 170, 179 (4th Cir. 2002), aff'd 540 U.S. 614 (2004); see also 5 U.S.C.

§552a(g)(1)(D).  To implement the Privacy Act, the Department of Defense ("DoD") has

established rules and guidelines for the maintenance and disclosure of DoD and Navy

agency records.  See 32 C.F.R. §310 (DoD Privacy Act Rules).[1]

---

[1]  The DoD Privacy Act Rules are specifically applicable to "the Military Departments."  See 32 C.F.R. §310.2.  As such, they are binding on the Navy, as it is a Military Department.  Id.

Actions to enforce rights under the Privacy Act, however, must be brought "within two years from the date on which the cause of action arises." 5 U.S.C. §552a(g)(5).  The two-year statute of limitations begins to run when a plaintiff knows or has reason to know of a violation.  See Tijerina v. Walters, 821 F.2d 789, 798 (D.C. Cir. 1987); Diliberti v. United States, 817 F.2d 1259 (7th Cir. 1987); Brown v. Dep't. of Veteran's Affairs, No. 94-1119PLF, 1996 U.S. Dist. LEXIS 6796 (D.D.C. 1996).  Failure to file a Privacy Act claim within the two-year period deprives a court of subject matter jurisdiction and bars the action because the statute of limitations is an integral condition of the sovereign's consent to be sued under the Privacy Act.  See Diliberti, 817 F.2d at 1262 (action by Army Reserve lieutenant colonel and full-time civil service employee alleging records used by superiors in evaluation deprived him of promotions); Bowyer v. United States, 875 F.2d 632, 635 (7th Cir. 1989) (affirming dismissal and holding that two-year statute of limitations applicable to air force employee began to run when employee learned of the existence of records); Brown, 1996 U.S. Dist., LEXIS at *4 (plaintiff's complaint that medical records were released without his authorization barred when he knew or had reason to know of the disclosure two and a half years earlier as evidenced by his federal tort claim submission against the Dept. of Veteran's Affairs).

Plaintiff here alleges that the disclosure of information about his removal from command took place on October 18, 2004, the publication date of the Marine Corps Times article.  However, the actions in dispute are those of Marine Corps officials in disclosing

the information to the Marine Corps Times, not of the Marine Corps Times - a private

entity - in publishing the information.  The date the Marine Corps made the allegedly

unlawful disclosure of information to the Marine Corps Times was on October 5, 2004,

when Maj. Gen. Stalder submitted written responses to questions to the Marine Corps

Times reporter.  <u>See</u> Marine Corps Times article dated October 18, 2004; <u>see</u> Exhibit A.

Even that date, however, might not trigger the running of the statute of limitations if

plaintiff did not know or have reason to know of the disclosure on that date.  <u>See</u> <u>Tijerina</u>,

821 F2d at 798.   The Marine Corps no longer has records of its responses to questions

posed by the article author, and the exact day on which plaintiff became aware of the

Marine Corps' disclosure of information to the Marine Corps Times is not clear from the

article.  But it is clear that plaintiff must have known about the disclosure some time

before the October 18, 2004 publication date.  Plaintiff is quoted in the article after

responding with his own written response to questions to the Marine Corps Times writer.

Because that interchange between plaintiff and the reporter must necessarily have occurred

before the publication date of the article, plaintiff clearly had knowledge before October

18, 2004, that the Marine Corps Times had obtained information from Marine Corps

officials about his removal from command.  The instant action was filed on October 18,

2006, more than two years after plaintiff knew or should have known of the alleged

unauthorized release of records.  _

## II.    THE NAVY IS ENTITLED TO SUMMARY JUDGMENT AS A MATTER OF LAW UNDER FED. R. CIV. P. 56(c)

### A.    Applicable Legal Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "By its terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  Consequently, "[o]nly disputes over the facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id. at 248.  Summary judgment should therefore be granted if the moving party submits "affirmative evidence that negates an essential element of the nonmoving party's claim or by demonstrating to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim."  High Tech Gays v. Defense Industrial Security Clearance Office, 895 F.2d 563, 574, rehearing denied, 909 F.2d 375 (9th Cir. 1990), citing Celotex Corp., 477 U.S. at 331.  The nonmoving party, on the other hand, is "required to provide evidence that would permit a reasonable jury to find" in his or her favor.  Laningham v. United States Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

Courts reviewing summary judgment motions afford substantial deference to the

determinations of the agency involved, and its interpretation of its own regulations.  See

generally Bigelow v. Department of Defense, __ F.3d __, No. 99-5280, 2000 WL 898687,

at *1 (D.C. Cir. Jul. 14, 2000).  In the context of the military, deference is compelled by

serious separation of powers concerns when the civilian judiciary is asked to review

personnel decisions made by the military.  See Weiss v. United States, 510 U.S. 163

(1994); Goldman v. Weinberger, 475 U.S. 503 (1986); Chappell v. Wallace, 462 U.S. 296

(1983); Rostker v. Goldberg, 453 U.S. 57 (1981); Gilligan v. Morgan, 413 U.S. 1 (1973);

Orloff v. Willoughby, 345 U.S. 83 (1953).  Deference is particularly appropriate where the

plaintiff is asking that the Court review events and circumstances surrounding the

"considered professional judgement" of military officers concerning complex decisions

regarding the military force.  See generally Goldman, 475 U.S. at 509; Rostker, 453 U.S.

at 65.  Deference is also appropriately given to an agency's interpretation of its own

governing regulations and instructions.  Bigelow v. Dep't of Defense, __ F.3d __, No. 99-

5280, 2000 WL 898687, at *1 (D.C. Cir. Jul. 14, 2000).

## B.    Plaintiff Cannot Establish a *Prima Facie* Privacy Act Violation, Thus Entitling the Navy to Judgment as a Matter of Law

As noted above, to establish a *prima facie* Privacy Act cause of action, a plaintiff

must prove that the information released was maintained in a system of records, retrievable

by a personal identifier, and that the agency improperly disclosed the information.  Henke,

83 F.3d at 1459-1460.  Only upon establishing a *prima facie* Privacy Act case may a

plaintiff then attempt to establish an entitlement to damages.  Fisher, 934 F. Supp. at 468.

8

Here plaintiff cannot establish a *prima facie* Privacy Act violation.  Although the Privacy

Act provides certain safeguards for an individual against an invasion of personal privacy,

it allows certain conditions for disclosure and non-disclosure of private information

contained in agency records.  See 5 U.S.C. §552a(b).  Privacy Act protections do not

extend to information releasable under the Freedom of Information Act ("FOIA").  5

U.S.C. § 552a(b)(3).  Navy Privacy Act implementing regulations expressly provide that,

while information regarding administrative action taken against an officer is "generally not

releasable[,]" such information should be disclosed pursuant to a FOIA request where the

facts leading to the action are "particularly newsworthy..." 32 C.F.R.

§701.112(b)(2)(viii)(D) (1999).  These regulations expressly provide that information from

personnel records is not exempt from release under FOIA's section 552(b)(6) exception

when the public interest outweighs the service-member's privacy interest.  Id.,

§701.112(b)(2)(iii).  This policy is also clearly articulated in Navy Public Affairs

regulations directing that information releasable under FOIA should be released to the

media, even absent a formal FOIA application, when it involves matters of high media and

public interest.  SECNAVINST 5720.44A (Department of the Navy Public Affairs Policy

and Regulations), ¶0201.3., attached as Exhibit B.

　　　　Navy's position on this issue is not unique.  See Dunkelberger v. Dep't of Justice,

906 F.2d 779, 782 (D.C. Cir. 1990); Chang v. Department of the Navy, 314 F.Supp. 2d 35

(D.D.C. 2004) (where Navy Commanding Officer was relieved of command and awarded

non-judicial punishment ("NJP") after collision of his ship with a Saudi tanker. Navy's

disclosures of details in a Press Release and Responses to Questions to the media were

found to comply with navy regulations concerning the disclosure of "newsworthy" items.)

Disclosures of materials relating to investigations into alleged misconduct or inefficiency

of public officials are frequently not considered to be an unreasonable invasion of the

official's personal privacy. See 37 A. Am. Jur. 2d, Freedom of Information Acts §254

(1994)(footnotes omitted). "Information is not protected from disclosure merely because

it has been placed in a personnel file, where there is an overriding public interest in

information relating to investigations of alleged misconduct." Id.

The decision in Cochran v. United States, 770 F.2d 949 (11th Cir. 1985) is

especially persuasive. In Cochran, a senior Army officer claimed that a press release

disclosing the results of his NJP violated the Privacy Act. After reviewing the Army's

implementing regulations, the Privacy Act, the FOIA, and the acts' legislative histories,

the court held that "[t]he FOIA exception to the Privacy Act was included in the Privacy

Act 'to meet the objections of the press and media representatives that the statutory

[FOIA] rights of access to public records and the right to disclosure of government

information might be defeated if such restrictions [] were to be placed on the public and

press.'" Id. at 955, n.7. The Cochran court determined that, in light of this policy, the

public interest in "whether public servants carry out their duties in an efficient and law-

abiding manner" outweighed the officer's privacy interest in keeping the information of

his NJP proceedings confidential.  Id. at 956; see also 37 A Am. Jur. 2d Freedom of

Information Acts §254 (1994).

The record of aviation mishaps within the Marine Corps, and within plaintiff's

squadron, was clearly newsworthy, particularly within the Marine Corps Times' reading

audience.  The war in Iraq and the use of the nation's troops and equipment to fight the

war are national daily news items.  The Marine Corps Times article itself indicates that the

removal of plaintiff as Commanding Officer of his squadron came "at a time when Marine

aviation is in the early stages of one of the most intense safety crackdowns in recent

history." See Marine Corps Times article, at 1. See Exhibit A.   The Marine Corps'

response to a troubling record of mishaps by removing plaintiff or others similarly situated

from their positions is a matter of high public interest.  The fact that Maj. Gen. Stalder

kept his comments limited to the performance of the squadron, and the Marine Corps

spokesman declined a request for further comment in response to plaintiff's remarks

reflects the Marine Corps' officials attempts to balance the privacy interests of plaintiff

and his officers against the public's interest.[2]  See Ex. A.   Under these circumstances,

plaintiff cannot hope to succeed on any claim based on the complained-of Navy

disclosures to the Marine Corps Times.  For these reasons, the Navy is entitled to

---

[2]It is of note that plaintiff provided information concerning his relief of command
to the press.  As this lawsuit indicates, it appears that plaintiff would have the Privacy Act
interpreted in such a manner that would allow only him to comment on this important
public issue.

judgment as a matter of law and this case should be dismissed.

**C.    Plaintiff Cannot Demonstrate That The Defendant "Willfully and Intentionally" Disclosed any Documents in its System of Records**.

To rise to the level of "willful and intentional," the violation must be so "patently egregious and unlawful" that anyone undertaking the conduct should have known it "unlawful." Laningham v. Navy, 813 F.3d 1236, 1243 (D.C. Cir. 1987), *citing* Wisdom v. Department of Hous. & Urban Dev., 713 F.2d 422, 425 (8th Cir.1983), cert. denied, 465 U.S. 1021 (1984). And the burden of proving a "willful and intentional" violation is upon the plaintiff at all times. Laningham, 813 F.3d at 1243; Doyon v. U.S. Department of Justice, 304 F. Supp.2d 32, 34 (D.D.C. 2004).

Meeting the "willful and intentional" requirement is extremely demanding. To establish a "willful" or "intentional" disclosure, a claimant must "prove that the agency 'acted with something greater than gross negligence.'" Deters v. United States Parole Comm'n, 85 F.3d, 655, 660 (D.C. Cir. 1996) *quoting* Tijerina v. Walters, 821 F.2d 789, 799 (D.C. Cir. 1987). Thus, Plaintiff cannot avoid summary judgment by presenting evidence that the Government acted negligently, Moskiewicz v. Dept. of Agriculture, 791 F.2d 561, 565 (7th Cir.1986), or that the Government handled a matter in a disjointed or confused manner, Perry v. Block, 684 F.2d 121, 129 (D.C. Cir.1982), or that the Government acted "inadvertently [to] contravene" the Privacy Act. Albright, 732 F.2d at 189. "An agency acts in an intentional or willful manner 'either by committing the act without grounds for believing it to be lawful, or by flagrantly disregarding others' rights

12

under the Act.'" Id. (*quoting* Albright v. United States, 732 F.2d 181, 189 (D.C. Cir.

1984)). "[T]he violation must be so patently egregious and unlawful that anyone

undertaking the conduct should have known it unlawful." Deters, 85 F.3d at 660 (*quoting*

Laningham, 813 F.2d at 1242) (original internal quotation marks omitted). [3]

Plaintiff asserts in the complaint that "Agents of the Department of the

Navy...knowingly, intentionally, and willfully disseminated specific information pertaining

to Plaintiff...to the Marine Corps Times....causing [him] pecuniary loss and physical and

mental suffering. Complaint ¶¶ 20-21. But plaintiff does not allege any facts that would

support a finding of willful and intentional violation of the Privacy Act. He provided

information concerning his relief of command to the press and the fact that he was relieved

of his command was newsworthy. Furthermore, defendant followed its own regulations.

Even if the Court were to find that the disclosure is a violation of the Privacy Act, plaintiff

cannot show that the disclosure was willful and intentional which is a prerequisite to

recovery of damages under the Privacy Act.

---

[3]    The D.C. Circuit and others circuits have not hesitated to decide issues of
intent and willfulness under the Privacy Act at the summary judgment stage. See, e.g.,
Laningham, 813 F.2d 1236 (affirming entry of summary judgment for defendant because
Privacy Act plaintiff failed to show any genuine issue about defendant's intent);
Moskiewicz, 791 F.2d 561 (same); Perry, 684 F.2d 121 (same); see also Anderson v.
Liberty Lobby, 477 U.S. 242, 256 (1986); Laningham, 813 F.2d at 1241 n.6 (D.C.
Cir.1987) (summary judgment rules apply equally when the issue in dispute involves a
party's state of mind).

## **CONCLUSION**

The plaintiff's complaint should be dismissed with prejudice, for lack of subject

matter jurisdiction under Fed. R. Civ. P. 12(b)(1), and failure to state a claim under

12(b)(6), and the Navy is entitled to judgment as a matter of law under Fed. R. Civ. P.

56(c).

Respectfully submitted,


\_\_\_/s/_____
JEFFREY A. TAYLOR
D.C. Bar No. 498610
United States Attorney


\_\_\_/s/_____
RUDOLPH CONTRERAS
D.C. Bar No. 434122
Assistant United States Attorney


\_\_\_/s/_____
CHARLOTTE A. ABEL
D.C. Bar No. 388582
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C. 20530
(202) 307-2332


Of Counsel:
LCDR Heidi K. Hupp, JAGC, USN
General Litigation Division
Office of the Judge Advocate General
1322 Patterson Avenue Suite 3000
Washington Navy Yard D.C. 20374-5066

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                          )
BRADLEY L. LOWE,                          )
                                          )
                                          )
                    Plaintiff,            )
                                          )        No. 1:06CV01803 (ESH)
            v.                            )        ECF
                                          )
DONALD C. WINTER,                         )
SECRETARY OF THE NAVY,                    )
                                          )
                    Defendant.            )
_____ )

ORDER

UPON CONSIDERATION of federal defendant's Motion to Dismiss, or in the

Alternative, for Summary Judgment, and for good cause shown,

it is this _____ day of _____, 2007,

ORDERED, that federal defendant's motion should be, and it hereby is, granted.

IT IS FURTHER ORDERED, that the case is dimissed.


                                   _____
                                   UNITED STATES DISTRICT JUDGE

FW Sacked story.txt

Subject: FW: Sacked story

From: Beth Zimmerman [mailto:bzimmerman@atpco.com]
Sent: Thursday, January 25, 2007 11:11
To: Delarosa Capt Manuel J
Subject: FW: Sacked story


PubDate: 10/18/2004     Byline: By Christian Lowe
Byline: Times staff writer     Publication: MARINE CORPS TIMES
Comments/Corrections: 5 COLOR PHOTOS. 1 PHOTO IS OF SCARFACE BADGE.
Comments/Corrections: COVER HED: Sacked in Iraq / Squadron CO, XO, 3
others sent packing -- what went wrong. SEE: MC-Cover 10/18.
Story Type: COVER     Tagline: Christian Lowe covers Marine Corps
aviation issues. He can be reached at (703) 750-8613 or
clowe@marinecorpstimes.com.
Tagline: Staff writer Gordon Lubold contributed to this report.

---

Cleaning house

5 leaders in 1 squadron fired over high rate of accidents

The squadron commander had a hint that his job was on the line, but the rest of his
top staff members probably never saw it coming.

There had been a handful of accidents since he assumed command, but he hadn't been
responsible for the loss of any Marines or equipment.

However, as the commander of a light attack helicopter squadron at war in Iraq at a
time when Marine aviation is in the early stages of one of the most intense safety
crackdowns in recent history, those mishaps proved to be more than one squadron
could bear.

After the fifth accident in 11 months, the 3rd Marine Aircraft Wing commander had
seen enough. It was time to clean house.

In what could be called a "decapitation strike," Maj. Gen. Keith J.
Stalder fired both the commanding and executive officers of Marine Light Attack
Helicopter Squadron 367.

It was the 3rd MAW's deputy commander, Col. Roy Arnold, who did the deed, making the
trip to Camp Taqaddum, Iraq, from Al Asad Air Base for a meeting with the two
squadron leaders Oct. 2. Arnold relieved the CO, Lt. Col. Bradley L. Lowe, and the
XO, Lt. Col. Nathan S. Cook, who had pinned on his silver oak leaves the day before.
Both were immediately shipped home to Camp Pendleton.

But Stalder's bloodletting didn't stop there. He also ordered the reassignment of
the squadron's operations officer, Maj. Michael S.
Cuningham; the safety officer, Maj. Sean P. Mattingly; and the maintenance chief,
Master Sgt. Billy F. Dial. ;Stalder termed the move "the only way to break the
trend" of accidents within the squadron.

"Making a decision like this one is very difficult, but serious measures need to be
taken," Stalder said Oct. 5 in a written response to questions. "When we lose
aircraft and people in mishaps we are doing the work of the enemy.

"The squadron has performed combat missions well, but the rate at which it was
losing aircraft and personnel from mishaps is unacceptable."

But information provided by Lowe and official records contradict Stalder's assertion
about HMLA-367's accidents.

FW Sacked story.txt

A 3rd MAW spokesman later clarified Stalder's statement, saying the reference to lost personnel was in regard to the entire wing.

Lowe and Cook were replaced by Lt. Col. Stephen Hall and Maj. Thomas Post, both of HMLA-169. The Corps didn't say who replaced the other three Marines.

"I did the best I could with the assets I had and the guidance that was given," Lowe said in a written response to questions from Marine Corps Times. "I have all of my aircraft and no one has been hurt on my watch.
I have no regrets."

Cook could not be reached for comment.

New pressure on leaders

The rash of firings and reassignments is the first known example of squadron leaders paying such a stiff penalty for mistakes in their squadron -- an outgrowth of new and intense pressure on aviation leaders to stem the tide of deadly accidents and downed aircraft. In fiscal 2004, the worst for Marine aviation in 13 years, the Corps lost 19 aircraft and 15 Marines -- most during non-combat training flights. Lt.
Gen. Mike Hough, the deputy commandant for aviation, vowed this summer to hold leadership accountable and called on his wing commanders to follow through.

But some aviators feel the unprecedented move to fire five squadron leaders smacks of overkill -- an overreaction to pressures from the commandant and his deputy for aviation. Some also wonder whether Stalder's housecleaning could chill other commanders' war-fighting zeal, spurring them to focus more on safety than on mission accomplishment.

But others say HMLA-367 was in a safety tailspin, that the leadership had not broken the trend and that wiping the slate clean was the only thing to do.

A question of timing

Among Marines, the squadron commander is responsible for everything that happens -- good or bad -- on his watch. And the five accidents HMLA-367 recorded over 11 months didn't reflect well on Lowe.

Two were Class A accidents, having caused more than $1 million in damages. Three were Class C accidents, having caused between $20,000 and $200,000 in damages.

But an examination of the accident records and statements from squadron members and the commander himself cast doubt on whether some of the accidents Stalder pinned on Lowe were Lowe's responsibility.

"I believe that there was some confusion in the numbers and severity of HMLA-367's mishap record during my command," Lowe wrote. "Did we have some opening day jitters? Sure."

Officials with 3rd MAW blame Lowe for the two Class A mishaps: the Oct. 22, 2003, crash of a UH-1N Huey at Marine Corps Air Ground Combat Center in Twentynine Palms, Calif.; and the Jan. 23 crash of an AH-1W Super Cobra at Marine Corps Air Station Yuma, Ariz.

Both aircraft were destroyed, but no Marines were injured. The Judge Advocate General manual investigation reports on each crash have not been released.

Though Stalder held Lowe responsible for these accidents, the 3rd MAW spokesman, Maj. Sean Clements, said neither could be directly tied to Lowe's command. The October crash occurred nearly a month before Lowe joined HMLA-367; he took command Nov. 20, 2003. And the January crash involved a Super Cobra from his squadron, but

FW Sacked story.txt
it was not flown by pilots under his command.

"However, since it was my aircraft, the accident is officially counted against the
squadron," Lowe wrote.

Lowe deployed to Iraq with 345 personnel, but left his aircraft at home.
Instead, the Marines of HMLA-367 flew the helicopters left there by a previous
squadron, including 18 Super Cobras and nine Hueys.

The executive officer's accountability for the Class A accidents, too, is
questionable. Cook moved to Camp Pendleton in August 2003 and joined
HMLA-367 after a brief round of Super Cobra refresher training. It wasn't clear what
billet Cook held upon joining the squadron, but he didn't become XO until February,
well after the two Class A mishaps.

The case for holding Lowe and Cook responsible for the Class C accidents is more
clear cut, as all three happened after the two settled into their leadership posts.

But in his written response, Lowe stressed that two of the three came during the
squadron's first month of combat operations after deploying to Iraq in mid-August.

One, which involved a Super Cobra, happened during a nighttime mission to support
raids conducted by Marines in western Iraq. While checking on a malfunctioning
generator box in the cockpit during the Sept. 10 mission, the Cobra pilot
temporarily lost control of the aircraft and the helicopter's tail boom dipped,
hitting the waters of the Euphrates River, according to squadron members who spoke
on condition of anonymity.

The Super Cobra's tail rotor sustained minor damage and was ready for operations the
next day, the squadron members said.

A little more than a week later, on Sept. 18, another of Lowe's Super Cobras drifted
into a parked UH-60 Blackhawk helicopter while taking off after a nighttime
refueling stop. The Super Cobra sustained only minor damage but one of the
Blackhawk's rotor blades was damaged and had to be replaced.

"There are few things tougher than operating a helicopter on night-vision goggles
and in a dusty desert environment," Lowe explained.
"I believe that this has been proven over and over in the past three years since
Operation Enduring Freedom commenced."

The third Class C accident came before the squadron deployed; a Huey made a hard
landing during a June 8 training flight at Camp Pendleton.
One of the Huey's skids was bent during the landing, but one squadron Marine said
the accident might have been due to faulty metal rather than a hard landing.

Clements, the 3rd MAW spokesman, declined a request for further comment from wing
leaders to address Lowe's remarks, or to answer questions regarding the dismissal of
the squadron's senior staff and whether Lowe had been given any warning of his
impending dismissal.

After the second accident in Iraq, Marine Aircraft Group 16 commander Col. Guy M.
Close traveled to Camp Taqaddum, expressing concern about the two mishaps and
telling the squadron to shape up, according to active-duty Marines familiar with the
incident.

The crackdown begins

After a one day stand-down in which squadron leaders called for a renewed focus on
safety, the squadron returned to its 24/7 pace of combat operations.

"I believe I was an excellent CO to HMLA-367 and I believe you will find that
opinion throughout the squadron. I stand by every command decision I have made,"
                                     Page 3

FW Sacked story.txt

Lowe wrote.

Records from the Naval Safety Center in Norfolk, Va., offer perspective on HMLA-367's safety record during fiscal 2004. Over the course of the year, the Corps suffered a total of 24 Class C accidents. Of those 24, eight involved Hueys or Super Cobras -- three of which were under Lowe's command.

At the same time, the Corps suffered 18 Class A mishaps involving 22 aircraft -- many of them during peacetime operations.

Hough, the Corps' aviation chief, launched the Corpswide aviation safety crackdown in August in reaction to the high number of accidents that occurred during routine training or "administrative" portions of flights, such as returning to base or flying to a range.

"We are killing more aircrew in training mishaps than during combat missions," Hough wrote late this summer in a message to his commanders.
"All aviation commands must support this effort to identify the hazards and implement the necessary controls to manage our risk so we can reverse this mishap trend."

In an Aug. 26 interview as Corps officials were rolling out details of the crackdown plan, Stalder vowed to hold his squadron commanders accountable for their accidents.

As he recounted the details of a December 2003 crash involving an AV-8B Harrier jet, which he attributed to pilot error stemming from "supervisory gaps," Stalder said he wouldn't stop at firing just a squadron commander.

"I told my commanders that if you do something like this, you're going to be gone, and probably some of the people who work for you are going to be gone.

"I did that ... to make them understand where I come from on the issue of accountability."

So far, Stalder is the first wing commander known to have made good on his promise to fire a squadron commander and his top staff for safety reasons.

In his Oct. 5 statement about the HMLA-367 firings, Stalder said the moves were intended to address a "trend" in the squadron that Lowe had failed to stop.

A tough decision

It is not clear whether the mass firing at HMLA-367 will have a chilling effect on other squadrons. Those who know Lowe say he was a top-notch pilot and that they were shocked to find out he was fired, voicing skepticism about the circumstances that led up to the firing.

"He is a very bright, very talented guy," said Maj. Clayton Bollinger, a Super Cobra pilot who served with Lowe in 1998. "When I heard he'd been fired, I was like 'whoa!'"

Meanwhile, others warn that firing or reassigning five squadron officials for a series of comparatively minor mishaps -- especially when two of them happened during the first few weeks of combat operations in a new environment -- could prompt other squadron commanders to focus more on safety than on supporting Marines in combat.

Although most didn't see the housecleaning coming, pilots in the community knew the hammer would drop on someone soon.

"It seems like they're trying to chop somebody's head off for the mishaps of the aviation community over the last two or three years,"
said 1st Lt. Jesse Hardin, a Cobra pilot with HMLA-367 who is now the officer in charge of the squadron's stateside detachment. Hardin flew in Iraq with HMLA-775 --

FW Sacked story.txt
a Reserve unit that HMLA-367 replaced in August -- as an augmentee.

"Somebody's head was going to go on the chopping block and it was a matter of time."

Even veteran pilots see Stalder's move as drastic, especially his decision to fire not just the CO, but also the XO, while reassigning the operations officer, safety officer and maintenance chief.

Even though they grudgingly concede that Lowe should be held accountable for the record of the squadron, tossing out the others was over the top.

"Historically, you relieve the [commander] not because he did anything wrong but because you've lost confidence in him," said retired Col.
Barry Ford, a Cobra pilot who served with HMLA-367 during the 1991 Persian Gulf War.
"But by relieving so many ... it seems to me to be a massive overkill."

"The only thing I can think of is it's to set an example."

Other veteran aviators spoke of the difficult decisions both squadron leaders and their superiors must make in combat zones.

"It's absolutely unfortunate for those involved, and my heart goes out to them," said retired Maj. Gen. William Whitlow, a former assistant wing commander.

Whitlow, a Huey pilot, said he understands commanders in the field face enormous challenges. But he also acknowledged that their senior commanders must hold them responsible if they don't agree with the choices made in the field.

"They operate in a very harsh and demanding environment and the commanders have to make very difficult and timely decisions that hold Marines' futures in their hands," Whitlow said.

"But it's up to the commanding general to make the decisions he has to make regardless of the type of environment they're operating in."

Whitlow added that he knows the senior commanders at 3rd MAW, including Stalder, to be "extremely competent, qualified and absolutely fair" Marine officers.

Although Lowe expressed a strong desire that the firings remain discreet, he took full responsibility for his actions and said he understood the pressure Stalder has been under to turn around one of the worst years in Marine Corps aviation safety history.

"Am I disappointed? No. I am personally devastated," he wrote. "However, it is not what's best for me, it is what is best for the squadron. I wish the new commander well."


Beth Zimmerman
Deputy News Editor / Marine Corps Times
6883 Commercial Drive, Springfield, Va. 22159 Work 703.750.8687 / Cell
703.380.5885



SECNAVINST 5720.44B

NOV 1  2005

# PUBLIC AFFAIRS POLICY

# & REGULATIONS



**DEPARTMENT OF THE NAVY**
OFFICE OF THE SECRETARY
1000 NAVY PENTAGON
WASHINGTON, DC 20350-1000

SECNAVINST 5720.44B
OI-5
01 Nov 05

SECNAV INSTRUCTION 5720.44B

From:  Secretary of the Navy

Subj:  DEPARTMENT OF THE NAVY PUBLIC AFFAIRS POLICY AND
       REGULATIONS

1.  Purpose.  To provide basic policy and regulations for
carrying out the public affairs and internal relations programs
of the Department of the Navy.  This instruction is a complete
revision and should be reviewed in its entirety.

2.  Cancellation.  SECNAVINST 5720.44A and CHINFO RCSs 5720-1,
5720-2, and 5720-3.

3.  Scope, Organization and Design of this Instruction.  This
instruction, applicable throughout the Department of the Navy, is
organized in two tiers.  Policy and regulations directive in
nature are presented in this document.  Procedural guidance on
implementing regulations and policy is provided separately as
supplemental public affairs guidance via public affairs channels.

4.  Administration and Maintenance.  The Chief of Information
(CHINFO) is assigned responsibility for the implementation and
administration of these regulations and is authorized to issue
any subsequent changes.  Submit recommendations for changes and
improvements, with supporting data, to CHINFO.

5.  Forms.  These forms are available electronically on the
Department of Defense (DOD) forms website at
http://www.dtic.mil/whs/directives/infomgt/ forms/ddforms2500-
2999.htm

| Form | Title |
|------|-------|
| DD 2535 | REQUEST FOR MILITARY AERIAL SUPPORT |

4. <u>The Power of the Internet</u>.  DON information on the Internet must be accurate and current.  The public will consider a web site or other Internet tool as trustworthy only if it meets both criteria.

**0201     FREEDOM OF INFORMATION ACT (FOIA)**

1. <u>Policy</u>.  Any person or organization, either U.S. or foreign, may request information under the Freedom of Information Act (FOIA).  A request for information does not constitute a FOIA request unless it is in writing, cites or implies FOIA, reasonably describes the records being sought so that a knowledgeable official of the agency can conduct a search with reasonable effort, and if fees are applicable, includes a statement regarding willingness to pay all fees or those up to a specified amount or request a waiver or reduction of fees.  If the request does not meet these minimum requirements, the requestor should be advised and assisted in perfecting the request.

2. <u>FOIA Responsibilities</u>.  FOIA responsibilities will be assigned to non-public affairs personnel unless the size of the command, manning or other circumstance leaves no alternative. This also helps serve as a check and balance between PA and FOIA authorities by promoting an exchange of knowledgeable views. However, PAOs should be familiar with major elements of FOIA. In all cases, PAOs should accept any FOIA request sent to them and forward to the cognizant FOIA authority.

3. <u>Release of Information Without a FOIA Request</u>.  Information releasable under FOIA will be released without the requestor having to submit a FOIA request, particularly if the requestor is a news media representative.  Release of information without requiring a FOIA request will often save labor and cost for both the requestor and the DON activity.

4. <u>Keystone of the FOIA</u>.  Disclosure should be the rule, not the exception.  All individuals have equal rights of access to information.  The burden is on the government to justify the withholding of a document, not on the person requesting its disclosure.  Individuals denied access to documents have a right to appeal the determination and seek legal action.

5. <u>FOIA Exemptions</u>.  A variety of conditions exempt the government from releasing information under FOIA.  Most news media will not initially request information through FOIA, but

SECNAVINST 5720.44B
01 Nov 05

instead will submit a request as a media query.  PAOs must consider whether that information is releasable under FOIA.  If there is any doubt, the activity's FOIA authority should be consulted.  See references and supplemental guidance.

6.  FOIA guidance, policy memorandums, points of contact, and an electronic reading room of certain released documents, see www.foia.navy.mil.

## 0202    PRIVACY ACT

1.  Background.  The Privacy Act protects individual privacy from unwarranted invasion by the government and is applicable to all federal agencies.  For PAOs, the act is especially applicable to information taken in support of visits by civilians to units and to information taken from personnel for internal news article production.  See references for details of the act.  Major features of the act about which PAOs should be aware include:

a.  The government is prohibited from keeping personal record systems that are secret or unreported.  For a listing of DON approved Privacy Act systems of records, see www.privacy.navy.mil.

b.  Agencies may collect only such personal information that is relevant and necessary to carry out a purpose required by statute or executive order.

c.  Personal information collected for one purpose cannot be used for another purpose without the consent of the individual on whom information is maintained.  When collecting personal information, agencies must provide the four-point Privacy Act statement to the individual.

d.  Agencies must publish notices regarding the "routine" uses of collected personal information.  They must obtain written consent from the individual to use personal information for any other unstated purpose or to transfer such information to another agency where "need to know" has not been previously and officially established.

e.  Individuals have the opportunity under law to see what information about them is being kept and to challenge its accuracy.

f.  Agencies must establish appropriate administrative, technical and physical safeguards for records and documents and must also establish rules of conduct and training for employees about their rights and responsibilities under the act.

g.  Limits the use of social security numbers.

2.  Privacy Act Exceptions.  The Privacy Act allows release of personal information without the consent of the individual under 12 conditions.  PAOs should consult the Navy's Privacy Act instruction and/or the activity's legal advisor to discuss the applicability of such disclosures.  (See references and supplemental guidance.)

## 0203    THE BALANCING TEST

1.  Background.  According to the Privacy Act, "records" will not be disclosed without the written consent of the person to whom the records refer unless disclosure of the records falls within an exception, including disclosure required by the Freedom of Information Act.  FOIA requires – with certain exceptions – that properly requested records be made available to anyone.  One of the exemptions is for "personnel and medical files and similar records, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." The legislative history of FOIA notes that the act "enunciates a policy that will involve a balancing of interests between the protection of an individual's private affairs from unnecessary scrutiny, and the preservation of the public's right to governmental information."  (See references for details)  The Supreme Court has also commented on the balancing test, noting that the "Congress sought to construct an exemption that would require a balancing of the individual's right to privacy against the preservation of the basic purpose of the FOIA, to open agency action to the light of public scrutiny."

2.  Considerations.  The following have general application to DON public affairs, and should be taken under consideration by PAOs when applying the balancing test:

a.  Federal employees have no expectation of privacy regarding their names, titles, grades, salaries, and duty stations as employees or regarding the parts of their successful employment applications that show their qualifications for their positions.

b.  Military personnel have no expectation of privacy regarding their name, rank, gross salary, duty assignments, duty phone numbers, source of commission or enlistment, promotion sequence number, awards and decorations, professional military education, duty status, and other non-sensitive details of individual military personnel, as well as comparable information concerning individual civilian employees.  Certain restrictions may apply to personal information when the release of that information would endanger personnel.  (See Article 0206)

c.  If the information is particularly well known; widely available within the public domain; or the individual has made the information public, there is generally no expectation of privacy.

d.  If the information was at some time or place available to the public, but is now hard to obtain (i.e., practical obscurity), the individual to whom it pertains may have a privacy interest.

e.  That some members of the public may know the information does not negate the individual's privacy interest in preventing further dissemination.

f.  An individual does not have any expectation of privacy with respect to information made public by that individual. Individuals do not surrender all rights to privacy by placing themselves in the public eye, but their expectations of privacy should be diminished, particularly regarding the information they made public.

g.  Death generally extinguishes an individual's privacy rights.  However, surviving family members may have a legitimate privacy interest.  Particularly sensitive personal details about the circumstances surrounding an individual's death may be withheld when necessary to protect the privacy interests of surviving family members.

h.  Individuals who testify at criminal trials do not forfeit their rights to privacy except on those matters becoming part of the public record.  Witnesses who provide information to investigative bodies – administrative, civil or criminal – ordinarily are accorded privacy protection.

i.  Any general public interest in mere allegations of wrongdoing does not necessarily outweigh an individual's privacy

interest in unwarranted association with such allegations. Even
when allegations of misconduct are known, the accused individual
ordinarily has an overriding privacy interest in not having the
details of the matter disclosed.

j. Proven wrongdoing of a serious and intentional nature by
a high-level government official is of sufficient public
interest to outweigh the privacy interest of the official. Less
serious misconduct by lower-level agency employees generally is
not considered of sufficient public interest to outweigh the
privacy interest of the employee.

k. In general, DON regards flag and general officers,
commanding officers, officers-in-charge, and both uniformed and
civilian personnel in similar positions as high-level officials.
Their diminished expectation of privacy is created by DON's need
to retain the public's confidence and trust.

## 0204    SECURITY AND POLICY REVIEW

1. General. All commanders will ensure PAOs have the adequate
clearance and access to policy and classified information in
order to best serve the government's interests.

2. Reviews by Releasing Authority. Each activity will review
material prepared for public release to ensure it reveals no
classified information or sensitive unclassified information.
While other commands must be consulted where necessary, and
subordinate commands may be the originator of the information,
the releasing authority cannot avoid its responsibility to
safeguard classified or sensitive unclassified information.

3. Reviews by Higher Authority. Certain categories of official
DOD information meant for release and prepared by or for DOD
personnel will be submitted for review and clearance. (See
supplemental guidance for details.)

4. Submission Procedures. After command and, if necessary,
chain of command review, information releases which fall into
any of the above categories must be submitted to CHINFO or DIRPA
for policy review and/or to CNO (N09N2) or Marine Corps Code
INTC for security review.

5. Voluntary Review. Sources outside of DOD, or DOD personnel
acting in a private capacity, may volunteer to have information
reviewed.