UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BRADLEY L. LOWE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO.  1:06-cv-01803-ESH |
| | ) | |
| | ) | |
| DONALD C. WINTER | ) | |
| Secretary of the Navy | ) | |
| Department of the Navy | ) | |
| Defendant. | ) | |
| | ) | |

## **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Department of the Navy ("Navy"), through undersigned counsel, hereby moves for

summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure in that there is

no genuine issue as to any material fact alleged in Plaintiff's complaint, and the Navy is entitled

to judgment as a matter of law, as more fully set forth in the memorandum of law attached

hereto.

Respectfully submitted,


__/s/_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


_/s/_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


_/s/_____
CHARLOTTE A. ABEL D.C. Bar # 388582
Assistant United States Attorney

United States Attorney's Office
Civil Division
555 Fourth Street, NW
Washington D.C.   20530
(202) 307-2332


STEPHEN C. REYES, JAGC, USN
Lieutenant Commander
General Litigation Division
Office of the Judge Advocate General
1322 Patterson Avenue Suite 3000
Washington Navy Yard D.C. 20374-5066
OF COUNSEL

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BRADLEY L. LOWE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO.  1:06-cv-01803-ESH |
| | ) | |
| | ) | |
| DONALD C. WINTER | ) | |
| Secretary of the Navy | ) | |
| Department of the Navy | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## I
## Introduction

Plaintiff filed this action seeking monetary damages and attorney's fees against the Department of the Navy under the Privacy Act, 5 U.S.C. § 552a.  Specifically, Plaintiff alleges that Defendant "maintained records in a system of records within the meaning of the Privacy Act regarding Plaintiff's relief from command and the circumstances surrounding his relief" and that Defendant "knowingly, intentionally, and willfully disseminated specific information pertaining to Plaintiff and protected by the Privacy Act to the Marine Corps Times, a private entity." (Complaint at ¶¶19, 20.)

Summary judgment is proper in this case because plaintiff cannot prove that: (1) there was an improper disclosure of information retrieved from a record within a system of records within the meaning of the Privacy Act, (2) defendant acted willfully and intentionally, (3) he

suffered actual damages, and (4) the information was releasable under the Freedom of Information Act.

## II

## Statement of Facts

On November 20, 2003, Plaintiff assumed command of a Marine Corps squadron, Helicopter Marine Light Attack 367 (HMLA 367), 3rd Marine Aircraft Wing (3dMAW), I Marine Expeditionary Force (IMEF), Camp Pendleton, CA. On August 18, 2004, plaintiff's squadron deployed to Iraq for Operation Iraqi Freedom II. On October 2, 2004, three months after arriving in Iraq, Plaintiff was relieved of his command by his Commanding General, Major General Keith J. Stalder USMC.[1] The reason for the removal was the high rate of aircraft accidents that occurred while plaintiff was the commanding officer.

Subsequently, the Marine Corps Times, submitted a media request to the 3dMAW's Public Affairs Officer, Major Sean Clements, USMC, about Plaintiff's removal. (Declaration of Major Sean Clements, USMC, Exh. A.) Major Clements and Lt. Gen. Stalder prepared a written response. (Id.) This response was no more than seventy words in length and set forth the reason for Plaintiff's removal. (Id.)

On October 5, 2004, the Marine Corps Times, published an article on Plaintiff's removal. (Marine Corps Times Article of Oct. 5, 2004, Exh. B.) The article referred to a written statement by General Stalder and statistics obtained from the Naval Safety Center. (Id.) On October 18, 2004, the Marine Corps Times published another story about Plaintiff's removal from command titled, "Sacked in Iraq - Squadron CO, XO, 3 others sent packing - what went wrong?" (Marine

---

1 General Stalder has since been promoted to the rank of Lieutenant General.

Corps Times Article of Oct. 18, 2004, Exh. C.)  This article was based primarily on an interview with the plaintiff; a written response to questions provided by Maj. Gen. Stadler; interviews of other members of the command; records from the Naval Safety Center in Norfolk relating to helicopter accidents that had occurred at the command; accident records; and undisclosed "official documents."

The article noted that plaintiff was released because of the recurring helicopter accidents during his command.  "After the fifth accident in 11 months, the 3rd Marine Aircraft Wing commander had seen enough. It was time to clean house. In what could be called a 'decapitation strike', Maj. Gen. Keith J. Stadler fired both the commanding and executive officers of Marine Light Attack Helicopter Squadron 367."  It further quoted a written response from Maj. Gen. Stadler, "'Making a decision like this one is very difficult, but serious measures need to be taken . . . When we lose aircraft and people in mishaps we are doing the work of the enemy. The squadron has performed combat missions well, but the rate at which it was losing aircraft and personnel from mishaps is unacceptable.'" (Id.)

The article listed plaintiff's name as the relieved Commanding Officer, but gave no other information about his individual performance, and went on to recount details provided by the plaintiff and anonymous squadron members about the aircraft mishap record of HMLA 367. The only official comments made by Marine Corps officials about plaintiff were in the October 5, 2004 "written response to questions." (Id.)

# III
# Argument

## A. Applicable Legal Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment:

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the overall scheme of the rules of civil procedure, which is to secure the just, speedy, and inexpensive determination of every action. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). The party moving for summary judgment bears the initial responsibility of informing the trial court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. Beard v. Goodyear Tire & Rubber Co., 587 A.2d 195 (D.C. 1991); Celotex Corp v. Catrett, supra, 477 U.S. at 323. The moving party has no burden, however, of introducing evidence negating the nonmovant's claim. Beard, supra, 587 A.2d at 198; Frito-Lay, Inc. v. Willoughby, 863 F.2d 1029, 1032 (D.C. Cir. 1988). Instead, where, as here, the nonmoving party has the burden of proof at trial, the moving party's burden is met by showing that there is an absence of evidence to support the nonmoving party's case. Beard, supra, 587 A.2d at 198; Celotex, supra, 477 U.S. at 325.

When the moving party has met its burden, the responsibility then shifts to the nonmoving party to show that there is, in fact, a genuine issue of material fact for trial.  <u>Beard</u>, <u>supra</u>, 587 A.2d at 198.  A motion for summary judgment should be granted unless the party opposing the motion counters the factual allegations with specificity.  <u>Miller v. American Coalition of Citizens with Disabilities, Inc.</u>, 485 A.2d 186 (DC App. 1984).  A trial court should enter summary judgment against a nonmoving party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial.  <u>Celotex</u>, <u>supra</u>, 477 U.S. at 322.

In order to recover monetary damages for an unlawful disclosure under the Privacy Act the Plaintiff must show that: (1) the information disclosed is a "record" within a "system of records"; (2) an agency improperly disclosed the information; (3) the agency's disclosure was willful or intentional; and (4) an adverse impact resulted from the disclosure.  <u>Logan v. Dep't of Veteran Affairs</u>, 357 F.Supp.2d 149, 154 (D.D.C. 2004).

**B. Plaintiff Cannot Demonstrate that there was an Improper Disclosure of Information Retrieved From a Record Within a System of Records.**

The Privacy Act protects the disclosure of records, contained within a system of records, by an agency.  Specifically, the act provides that:

> No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains[.]

5 U.S.C. § 552a(b).

**Record.**  A record is defined as "any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education,

financial transactions, medical history, and criminal or employment history that contains his name[.]" Id. at §552a(a)4.  Additionally, in order to qualify as a record the information must "(1) contain the individual's name or other identifying particular and (2) be 'about' the individual."  Fisher v. National Institutes of Health, et. al., 934 F. Supp. 464 (D.D.C. 1996)(citing Tobey v. N.L.R.B., 40 F.3d 469 (D.C. Cir. 1994); Logan, 357 F.Supp.2d at 154 (granting motion to dismiss because plaintiff failed to demonstrate that the disclosed information was about the plaintiff).

**System of Records**.  A "system of records" is "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual[.]" 5 U.S.C. §552a(a)5.  Additionally, the fact that records can be retrievable by an identifier is not sufficient to transform records into a system of records; the records must be accessed by the agency by an identifier.  Henke v. United States, 83 F.3d 1453 (D.C. Cir. 1996).

**Disclosure and the Retrieval Rule**.  Although the Act itself does not define the term "disclosure" the term has been defined by prior case law.  As a general rule, the Privacy Act covers disclosure of information which was either directly or indirectly retrieved from a system of records.  Under the Act, an improper disclosure requires more than "mere dissemination of information contained in the records, but instead, 'prohibits nonconsensual disclosure of any information that has been *retrieved* from a protected record."  Doe v. Henderson, 2001 U.S. Dist. LEXIS 25175 (D.D.C. 2001)(citing Bartel v. FAA, 125 F.2d 1403 (D.C. Cir. 1984))(emphasis added).  As noted by the Tenth Circuit, "[t]he disclosure of information derived solely from independent sources is not prohibited by statute even though identical information may be

contained in an agency system of records." Thomas v. United States Dep't of Energy, 719 F.2d

342, 345 (10th Cir. 1983). This is known as the retrieval rule. And it is based on the principal

that the purpose of the act is to prohibit "disclosure of information contained within the records

and **not merely the disclosure of information that an employer might know about an**

**employee**. Henderson, 2001 U.S. Dist. LEXIS 25175 at *46 (emphasis added)(citing Bartel, 725

F.2d at 1408; Wilborn v. Dep't of Health and Human Services, 49 F.3d 597, 600 (9th Cir.

1995)).

   **Exception to the Retrieval Rule**. The D.C. Circuit created a limited exception to the

retrieval rule in Bartel v. FAA, *supra*. This exception was based on the particular facts of that

case. Pilon v. Dep't of Justice, 73 F.3d 1111, 1117 (D.C. Cir. 1996). In Bartel, the chief of the

FAA ordered an investigation into Bartel. The investigation resulted in a report of investigation

that was protected under the Privacy Act. The chief later reported the contents of the file to third

parties. The government argued that there was no violation of the Act because the chief never

consulted the investigation before disclosing its contents. The court disagreed with the

government's position noting that under the government's theory, "an official could circumvent

[the Act] with respect to a record he himself initiated by simply not reviewing it before reporting

its contents or conclusions." Id. at 1409. The court held that the Privacy Act is not intended to

exempt those situations where an official used the government's "'sophisticated...information

collecting' methods to acquire personal information for inclusion in a record and then discloses

that information...without actually physically retrieving it from the record system." Id. at 1410.

   **Plaintiff's Removal From Command.** Plaintiff argues that the mere fact of his removal

from command was protected from disclosure under the Privacy Act. (Complaint at ¶19.) First,

Plaintiff is unable to show that his removal from command was disclosed by an official to the Marine Corps Times. As noted in the Declaration from Major Clements, USMC, the Marine Corps Times initiated contact with the command, inquiring about Plaintiff's removal. (Exh. A.)

Second, Plaintiff cannot demonstrate that the information that he was removed from command was **<u>retrieved</u>** from protected records. In fact, the Marine Corps Times article of October 5, 2004–the article that initially reported Plaintiff's removal–cited to a written statement by Lt. Gen. Keith Stalder. (Exh. B.) However, since Lt. Gen. Stalder was the commanding officer who removed Plaintiff from command, it defies logic to say that he retrieved this information from any records. Under the retrieval rule, Plaintiff cannot demonstrate a disclosure. See <u>Mulhern v. Gates</u>, 2007 U.S. Dist. LEXIS 88970 (D.D.C.).

Moreover, the facts of <u>Bartel</u> are readily distinguishable from this case, and its limited exception to the retrieval rule does not apply. First, in <u>Bartel</u> the Chief of the FAA initiated an investigation of the plaintiff and then disclosed the subject matter of the investigation in a letter. The results of investigation were protected under the Privacy Act. Here, there simply was no investigation. More importantly, Lt. Gen. Stalder did not obtain the knowledge of Plaintiff's removal from a protected record, such as, an investigation or from his role in preparing a protected record. In essence, Lt. Gen. Stalder was the Commanding General who removed Plaintiff from command and had personal knowledge of the event. <u>See</u>, <u>e.g.</u>, <u>Doe v. Dep't of Veteran Affairs</u>, 474 F. Supp. 2d 1100, 1102-03 (D. Minn. 2007)(official did not violate the Privacy Act when he disclosed medical information contained in a patient's protected record because he learned of the information from discussions with the patient and not by consulting the records).

**Circumstances Surrounding Plaintiff's Removal from Command**. Plaintiff alleges that the circumstances surrounding his removal from command was protected information under the Act. (Complaint at ¶ 19.)  This is a vague allegation and Plaintiff fails to cite specifically what those circumstances are and, more importantly, to identify the relevant records that were disclosed.  However, the Marine Corps Times articles notes that Plaintiff was removed from command due to five aviation mishaps.  (Exh. B, C.)  Additionally, the articles cite to documents obtained from the Naval Safety Center, accident records and undisclosed "official records."  (Id.) Plaintiff presents no evidence that records of these aviation mishaps were contained in "records within a system of records" per the Privacy Act.

The converse is true.  First, regarding the documents from the Naval Safety Center, the declaration from Nancy Jones, the attorney for the Naval Safety Center, notes that no records obtained by the Center are retrievable by personal identifiers.  (Declaration of Nancy Jones, Exh. D.)  Second, although it is uncertain what "accident reports" the article is referring to, the declaration from Colonel Vaughn Ary, the Staff Judge Advocate for 3rd Marine Aircraft Wing ("MAW"), states that no accident reports held by the 3rd MAW are retrievable by personal identifiers.  (Exh. E.)  Lastly, the article does not define the term "official records"; nonetheless, it can be ascertained from the article that these records dealt with aviation mishaps.  And the above declarations demonstrate that no records of aviation mishaps maintained by the command or the Naval Safety Center are retrievable by personal identifiers.

**C. Plaintiff Fails to Provide Evidence that Defendant's Conduct Was Willful**

**_and Intentional_**

        To rise to the level of "willful and intentional," the violation must be so "patently

egregious and unlawful" that anyone undertaking the conduct should have known it "unlawful."

Laningham v. Navy, 813 F.3d 1236, 1243 (D.C. Cir. 1987), citing Wisdom v. Department of

Hous. & Urban Dev., 713 F.2d 422, 425 (8th Cir.1983), cert. denied, 465 U.S. 1021 (1984).  And

the burden of proving a "willful and intentional" violation is upon the plaintiff at all times.

Laningham, 813 F.3d at 1243; Doyon v. U.S. Department of Justice, 304 F. Supp.2d 32, 34

(D.D.C. 2004).

        Meeting the "willful and intentional" requirement is extremely demanding.  To establish

a "willful" or "intentional" disclosure, a claimant must "prove that the agency 'acted with

something greater than gross negligence.'"  Deters v. United States Parole Comm'n, 85 F.3d,

655, 660 (D.C. Cir. 1996)(quoting Tijerina v. Walters, 821 F.2d 789, 799 (D.C. Cir. 1987)).

Thus, Plaintiff cannot avoid summary judgment by presenting evidence that the Government

acted negligently, Moskiewicz v. Dept. of Agriculture, 791 F.2d 561, 565 (7th Cir.1986), or that

the Government handled a matter in a disjointed or confused manner, Perry v. Block, 684 F.2d

121, 129 (D.C. Cir.1982), or that the Government acted "inadvertently [to] contravene" the

Privacy Act.  Albright, 732 F.2d at 189.  "An agency acts in an intentional or willful manner

'either by committing the act without grounds for believing it to be lawful, or by flagrantly

disregarding others' rights.'"

        The D.C. Circuit and others circuits have not hesitated to decide issues of intent and

willfulness under the Privacy Act at the summary judgment stage.  See, e.g., Laningham, 813

F.2d 1236 (affirming entry of summary judgment for defendant because Privacy Act plaintiff

failed to show any genuine issue about defendant's intent); <u>Moskiewicz</u>, 791 F.2d 561 (same);

<u>Perry</u>, 684 F.2d 121 (same); <u>see also</u> <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 256 (1986);

<u>Laningham</u>, 813 F.2d at 1241 n.6 (D.C. Cir.1987) (summary judgment rules apply equally when

the issue in dispute involves a party's state of mind).

     In this case, Plaintiff has failed to put forth any facts that may demonstrate intentional

and willful disclosure on behalf of the defendant.  The evidence proves otherwise.  For example,

the Marine Corps Times initiated contact with the command, and any release of information to

the Marine Corps Times was in response to a media request.  (Exh. A.)  Second, any release of

information to the Marine Corps Times was done pursuant to Navy regulations.  (Exh. A.)

Major Clement, the Public Affairs Office, responsible for media relations at the command, notes

that he followed SECNAVINST 5720.44B (Public Affairs Policy & Regulations) to determine

whether to release information to the Marine Corps Times. (<u>Id.</u>)  This regulation provides for the

release of information to members of the media absent a FOIA request.  <u>See</u> SECNAVINST

5720.44B, §201(2).

### D. Plaintiff Has Not Demonstrated Actual Damages Resulting From the Alleged Improper Disclosure.

     In his complaint, Plaintiff alleges that his actual damages consisted of: (1) pecuniary loss;

(2) physical and mental suffering; and (3) injury to his personal and professional reputation.

(Complaint at ¶15, 21.)  However, Plaintiff has offered no evidence of such damage**.**

     **Pecuniary Loss**.  Plaintiff fails to present any evidence that he suffered a pecuniary loss.

Moreover, since Plaintiff is a member of the military, who is paid according to rank, any

pecuniary loss he may have suffered with respect to the military would be a result of a lack of

promotion. In this case, Plaintiff cannot demonstrate that the alleged unlawful disclosure was the proximate cause of a failure to promote.

To be fair, Defendant attaches documents illustrating that Plaintiff was removed from a promotion list. (Addendum to Adverse Information Screening, Exh. F and Memorandum for the Secretary of the Navy, Exh. G.) As way of background, Plaintiff was originally selected for promotion to the next rank, Colonel. This selection must go through several layers of approval ranging from the Commandant of the Marine Corps to the Congress. During this process, a selectee's record is checked to determine whether there is any adverse information that justifies removing the selectee's name from the promotion list. (Exh. F.) In this case, Plaintiff's name was eventually removed from the promotion list because of his removal from command. (Exh. G.)

As noted in the Memorandum for the Secretary of the Navy from the Commandant of the Marine Corps, the sole reason for the removal of Plaintiff's name from the promotion's list was Plaintiff's removal from command. (Exh. G.) The memorandum makes no reference to the Marine Corps Times articles. In fact, the only time an article was mentioned was to notify the Commandant that Plaintiff had been removed from command. (Exh. F.) And it was the October 5, 2004 Marine Corps Times article that was cited. (Id.) The October 5th Article was merely an early warning of Plaintiff's removal. This fact would have been discovered through the normal channels, resulting in the same outcome. For example, once Plaintiff was removed from command, he was given a fitness report outlining his performance as commanding officer. (Fitness Report of Lt. Col. Lowe, dated Oct. 2, 2004, Exh. H.) Plaintiff received a "DC" fitness report. (Id.) A "DC" report is required when there is "significant commendatory or adverse

14

action...that requires immediate reporting to [the Commandant of the Marine Corps]." Marine

Corps Order P1610.7E, §3004 (Performance Evaluation System, PES). As such, absent the

Marine Corps Times article, the Commandant would have been informed of Plaintiff's removal

from command by Plaintiff's fitness report. Nonetheless, the decision to remove Plaintiff's

name from the promotion list was based on the fact that he was removed from command but not

on the Marine Corps Times article..

### Physical and Emotional Distress

Damages for emotional distress are not recoverable for a violation of the Privacy Act

lawsuit. Mallory, No. 97-2377, slip op. at 15-16 n. 3; Pope v. Bond, 641 F. Supp. 489, 500-01

(D.D.C. 1986)(recovery limited to out-of-pocket expenses); Houston v. United States Dep't of

Treasury, 494 F. Supp. 24, 30 (D.D.C. 1979)(same); Albright v. United States, 558 F. Supp. 260

(D.D.C. 1982), aff'd on other grounds, 732 F.2d at 183, 185-86, n.11. See Doe v. Chao, 539

U.S. 957 (2003). In Doe, 539 U.S. 957, the Supreme Court did not rule on the issue of whether

nonpecuniary damages for mental injury satisfies the definition of actual damages and noted a

division among the Circuits. The Court of Appeals for the District of Columbia Circuit has not

expressly ruled on this issue.

In the alternative, if this Court finds emotional damages to be recoverable, "a plaintiff

must offer evidence sufficient for a jury to find that the emotional harm he claims to have

suffered was acute, tangible, and severe enough to give rise to actual damages." Mulhern v.

Gates, 2007 U.S. Dist. LEXIS 88970, *30 (D.D.C. 2007). Plaintiff cannot rely on mere

conclusory statements as proof. Doe v. Chao, 306 F.3d 170, 180-82 (4th Cir. 2002)(plaintiff's

conclusory allegations were insufficient to create a triable issue of fact); Price v. City of

Charlotte, 93 F.3d 1241, 1254 (4th Cir. 1996)( "neither conclusory statements that the plaintiff suffered from emotional distress nor the mere fact that a...violation occurred supports an award of compensatory damages."; Dong v. Smithsonian Institute, 943 F. Supp. 69 (D.D.C. 1996)(requiring that there be proof of emotional distress). In this case, Plaintiff presents no specific facts in support of his claim.

**Injury to Personal And Professional Reputation**

Plaintiff's claim that he suffered from injury to his personal and professional reputation suffers from the same defect. Furthermore, Plaintiff cannot demonstrate that any damage to his reputation was caused by the alleged improper disclosure instead of the fact that he was removed from command.

**E. Privacy Act and The Freedom of Information Act.**

Assuming *arguendo* that there was a disclosure of information protected by the Privacy Act, this information was releasable under the Freedom of Information Act (FOIA) and therefore not protected by the Privacy Act. Specifically, Plaintiff's removal from a command deployed in Iraq and the circumstances surrounding the removal was of significant public interest.

Navy's position on this issue is not unique. See Dunkelberger v. Dep't of Justice, 906 F.2d 779, 782 (D.C. Cir. 1990); Chang v. Department of the Navy, 314 F.Supp. 2d 35 (D.D.C. 2004) (Navy Commanding Officer was relieved of command and awarded non-judicial punishment ("NJP") after collision of his ship with a Saudi tanker. Navy's disclosures of details in a Press Release and Responses to Questions to the media were found to comply with Navy regulations concerning the disclosure of "newsworthy" items.)

16

The decision in <u>Cochran v. United States</u>, 770 F.2d 949 (11th Cir. 1985), is especially instructive.  In <u>Cochran</u>, a senior Army officer claimed that a press release disclosing the results of his NJP violated the Privacy Act.  After reviewing the Army's implementing regulations, the Privacy Act, the FOIA, and the Acts' legislative histories, the court held that "[t]he FOIA exception to the Privacy Act was included in the Privacy Act 'to meet the objections of the press and media representatives that the statutory [FOIA] rights of access to public records and the right to disclosure of government information might be defeated if such restrictions [] were to be placed on the public and press.'" <u>Id.</u> at 955, n.7.  The <u>Cochran</u> court determined that, in light of this policy, the public interest in "whether public servants carry out their duties in an efficient and law abiding manner" outweighed the officer's privacy interest in keeping the information from the press.  As this lawsuit indicates, it appears that plaintiff would have the Privacy Act interpreted in such a manner that would allow only him to comment on this important public issue.

The record of aviation mishaps within the Marine Corps, and within plaintiff's squadron, was clearly newsworthy, particularly within the Marine Corps Times' reading audience.  The fact that the Marine Corps Times published two stories on Plaintiff's removal is evidence that it was newsworthy.  Moreover, the war in Iraq and the use of the nation's troops and equipment to fight the war are national daily news items.  The Marine Corps Times' article itself indicates that the removal of plaintiff as Commanding Officer of his squadron came "at a time when Marine aviation is in the early stages of one of the most intense safety crackdowns in recent history."  Marine Corps Times article, at 1.  The Marine Corps' response to a troubling record of mishaps by removing plaintiff or others similarly situated from their positions is a

17

matter of high public interest.  The fact that Maj. Gen. Stalder kept his comments limited to the performance of the squadron, and the Marine Corps spokesman declined a request for further comment in response to plaintiff's remarks reflects the Marine Corps' officials attempts to balance the privacy interests of plaintiff and his officers against the public's interest.

Lastly, as stated above, the Public Affairs Officer abided by SECNAVINST 5720.44B to determine the release of information.  (Exh. A.)  According to this regulation, commanding officers, such as Plaintiff, are treated as high-level officials with a diminished expectation of privacy due to the Navy's need to "retain the public's confidence and trust." SECNAVINST 5720.4B, §203(k).

## IV.

### Conclusion

Plaintiff cannot establish that (1) there was an improper disclosure of information contained in a record within the meaning of the Privacy Act; (2) the Defendant's conduct was willful and intentional; (3) the Plaintiff suffered actual damages; and (4) the information was not releasable under the Freedom of Information Act.  As such, summary judgment for the Defendant is proper in this case.

Respectfully submitted,

____/s/_____

18

JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


_____/s/_____
CHARLOTTE A. ABEL D.C. Bar # 388582
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 Fourth Street, NW
Washington D.C.   20530
(202) 307-2332



STEPHEN C. REYES, JAGC, USN
Lieutenant Commander
General Litigation Division
Office of the Judge Advocate General
1322 Patterson Avenue Suite 3000
Washington Navy Yard D.C. 20374-5066
OF COUNSEL

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

BRADLEY L. LOWE                    )
                                   )
        Plaintiff,                 )
                                   )
        v.                         ) NO.  1:06-cv-01803-ESH
                                   )
                                   )
DONALD C. WINTER                   )
Secretary of the Navy              )
Department of the Navy             )
        Defendant.                 )
_____     )

## **DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

1.    On October 2, 2004, Plaintiff was removed from his command due to aircraft mishaps under his command. (Complaint ¶ 9.)

2.    On October 5, 2004, the Marine Corps Times published a story on Plaintiff's removal from command. (Exh. B.)

3.    The October 5th article cited to statistics obtained from the Naval Safety Center and a written statement from Maj. Gen. Keith J. Stalder, USMC. (Id.)

4.    On October 18, 2004, the Marine Corps Times published an additional article on Plaintiff's removal from command.  (Exh. C.)  This article was titled, "Sacked in Iraq - Squadron CO, XO, 3 others sent packing - what went wrong?" (Exh. C.)

5.    The October 18th article states that, "After the fifth accident in 11 months, the 3rd Marine Aircraft Wing commander had seen enough. It was time to clean house. In what could be called a 'decapitation strike', Maj. Gen. Keith J. Stalder fired both the commanding and executive officers of Marine Light Attack Helicopter Squadron 367." (Id.) The article further

-1-

quoted Maj. Gen. Stalder from a written response to questions dated October 5, 2004 as

saying, "'Making a decision like this one is very difficult, but serious measures need to be

taken . . . When we lose aircraft and people in mishaps we are doing the work of the enemy.

The squadron has performed combat missions well, but the rate at which it was losing aircraft

and personnel from mishaps is unacceptable.'" (Id.)

6.    The article listed plaintiff's name as the relieved Commanding Officer, but gave

no other information about his individual performance, and went on to provide details

gleaned from interviews with the Plaintiff himself and with anonymous squadron members

about the aircraft mishap record of HMLA 367. (Id.)

7.    The only official comments made by Marine Corps officials about Plaintiff were

in written response to questions. (Id.)


                    Respectfully submitted,


                    __/s/_____
                    JEFFREY A. TAYLOR, D.C. Bar # 498610
                    United States Attorney


                     /s/_____
                    RUDOLPH CONTRERAS, D.C. Bar # 434122
                    Assistant United States Attorney


                    __/s/_____
                    CHARLOTTE A. ABEL D.C. Bar # 388582
                    Assistant United States Attorney
                    United States Attorney's Office
                    Civil Division
                    555 Fourth Street, NW

-2-

Washington D.C.   20530
(202) 307-2332


STEPHEN C. REYES, JAGC, USN
Lieutenant Commander
General Litigation Division
Office of the Judge Advocate General
1322 Patterson Avenue Suite 3000
Washington Navy Yard D.C. 20374-5066
OF COUNSEL

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **BRADLEY L. LOWE**<br>**Plaintiff** | * | |
| | * | |
| **v.** | * | **CIVIL ACTION**<br>**NO.: 1:06-cv-01803-ESH** |
| | * | |
| **DONALD C. WINTER**<br>**Secretary of the Navy**<br>**Department of the Navy**<br>**Defendant** | * | **DECLARATION OF SEAN**<br>**CLEMENTS** |

            *    *    *

I, Sean Clements, hereby declare under the penalty of perjury that the following is true and correct:

1. I am a Major in the United States Marine Corps Reserves. In October 2004, I was on active duty, assigned to the 3rd Marine Aircraft Wing ("MAW"), based in Miramar, California, and deployed to Al Asad air base, Iraq. I was assigned as the Public Affairs Officer. I have personal knowledge of the matters set forth herein, and if called upon to testify, could and would competently testify thereto.

2. As the Public Affairs Officer, I was aware of the removal of Lieutenant Colonel Bradley Lowe from command of Marine Light Attach Helicopter Squadron 367. It was my responsibility to liaise with members of the press on any incident of public interest, including the removal of squadron leadership, within the MAW.

3. A reporter from the Marine Corps Times contacted the MAW about the removal for cause of Lieutenant Colonel Lowe. As the public affairs officer, it was my responsibility to prepare a response to this media request. In consultation with Major General Stalder and the Chief of Staff, I prepared a short statement. This statement consisted of no more than seventy words. I

do not recall any other information or documents being released to the Marine Corps Times by the MAW.

4.  In determining whether to release information to the Marine Corps Times I operated under and followed the Navy's guidance set forth in the PUBLIC AFFAIRS POLICY AND REGULATIONS INSTRUCTION, SECNAVINST 5720.44B

5.  I do not have any documents or other files related to the Marine Corps Times article.  Upon request by the Navy Litigation Office in January 2007, I contacted GySgt. Chad McMeen, the deployed Public Affairs Chief for 3rd MAW and requested that he look for any remaining information in the command files.  That search was unsuccessful.  I can only opine that the files may have been lost or destroyed due to the number of rotations of personnel and equipment in the two years since my departure from Iraq.

Executed this  11  day of  February 2008.


SEAN CLEMENTS

 

| | ? | ↑ ↓ |

| **From:** | Wenier Sgt Robert J |
| **To:** | Colwell LtCol Jeffrey P |
| **Cc:** | |
| **Subject:** | Early Bird Relief Article |
| **Sent:** | 10/7/04 9:37 AM | | **Importance:** | Normal |

---

MarineCorpsTimes.com
October 5, 2004

## Helo Squadron's CO, XO Fired

By Christian Lowe, Times staff writer

The commander and executive officer of Camp Pendleton, Calif.-based Marine Light Attack Helicopter Squadron 367 were relieved of their duties Oct. 2. Lt. Col. Bradley L. Lowe, the squadron commander, and Maj. Nathan S. Cook, the executive officer, were fired in Iraq due to "the rate at which [the squadron] was losing aircraft and personnel from mishaps," Maj. Gen. Keith J. Stalder, III Marine Air Wing commander, said in a written statement.

The squadron recently deployed to Iraq to replace HMLA-775 — a Reserve unit also based at Camp Pendleton. Lt. Col. Stephen W. Hall and Maj. Thomas E. Post are the squadron's new CO and XO.

The statement cited five aviation mishaps and "incidents" in the last 11 months that contributed to Stalder's decision.
A review of aviation mishap statistics maintained by the Naval Safety Center shows two serious accidents involving the squadron within the past year: one UH-1N Huey crash at the Marine Corps Air Ground Combat Center in Twentynine Palms, Calif., on Oct, 22, 2003, and an accident involving an AH-1W Super Cobra conducting daylight urban close-air support training at Marine Corps Air Station Yuma, Ariz., in January. No Marines were killed in either incident.

Spokesmen for III MAW were unable to provide details of the squadron's accidents as of Oct. 5. The squadron deployed to Okinawa, Japan, in July 2002 for a six-month Unit Deployment Program rotation that was extended to nearly one year before the squadron returned to Pendleton in June 2003. The squadron stayed on Okinawa for last year's invasion of Iraq, making this the squadron's first deployment to the country since then.

Lowe is a Super Cobra pilot and has deployed to Bosnia, Somalia and Kuwait. He deployed to Saudi Arabia as the senior Marine liaison with the Combined Air Operations Center during Operation Enduring Freedom. Lowe was assigned as the operations officer for Marine Aircraft Group 39 in May 2002 and deployed with the group to Kuwait in February 2003 for Operation Iraqi Freedom, returning in September 2003. He assumed command of HMLA-367 on Nov. 20.

Cook served as a weapons and tactics instructor with the 13th Marine Expeditionary Unit in the late 1990s and as a flight instructor in Corpus Christie, Texas. He joined HMLA-367 after AH-1W refresher training that began upon his assignment to Pendleton in August 2003 and became the squadron's executive officer in February.

*Christian Lowe covers Marine Corps aviation issues.*

00061

PubDate: 10/18/2004       Byline: By Christian Lowe
Byline: Times staff writer  Publication: MARINE CORPS TIMES
Comments/Corrections: 5 COLOR PHOTOS. 1 PHOTO IS OF SCARFACE BADGE.
Comments/Corrections: COVER HED: Sacked in Iraq / Squadron CO, XO, 3
others sent packing -- what went wrong. SEE: MC-Cover 10/18.
Story Type: COVER       Tagline: Christian Lowe covers Marine Corps
aviation issues. He can be reached at (703) 750-8613 or
clowe@marinecorpstimes.com.
Tagline: Staff writer Gordon Lubold contributed to this report.

---

Cleaning house

5 leaders in 1 squadron fired over high rate of accidents

The squadron commander had a hint that his job was on the line, but the rest of his top staff members probably never saw it coming.

There had been a handful of accidents since he assumed command, but he hadn't been responsible for the loss of any Marines or equipment.

However, as the commander of a light attack helicopter squadron at war in Iraq at a time when Marine aviation is in the early stages of one of the most intense safety crackdowns in recent history, those mishaps proved to be more than one squadron could bear.

After the fifth accident in 11 months, the 3rd Marine Aircraft Wing commander had seen enough. It was time to clean house.

In what could be called a "decapitation strike," Maj. Gen. Keith J.
Stalder fired both the commanding and executive officers of Marine Light Attack Helicopter Squadron 367.

It was the 3rd MAW's deputy commander, Col. Roy Arnold, who did the deed, making the trip to Camp Taqaddum, Iraq, from Al Asad Air Base for a meeting with the two squadron leaders Oct. 2. Arnold relieved the CO, Lt. Col. Bradley L. Lowe, and the XO, Lt. Col. Nathan S. Cook, who had pinned on his silver oak leaves the day before. Both were immediately shipped home to Camp Pendleton.

But Stalder's bloodletting didn't stop there. He also ordered the reassignment of the squadron's operations officer, Maj. Michael S.
Cuningham; the safety officer, Maj. Sean P. Mattingly; and the maintenance chief, Master Sgt. Billy F. Dial. ;Stalder termed the move "the only way to break the trend" of accidents within the squadron.

"Making a decision like this one is very difficult, but serious measures need to be taken," Stalder said Oct. 5 in a written response to questions. "When we lose aircraft and people in mishaps we are doing the work of the enemy.

"The squadron has performed combat missions well, but the rate at which it was losing aircraft and personnel from mishaps is unacceptable."

But information provided by Lowe and official records contradict Stalder's assertion about HMLA-367's accidents.

A 3rd MAW spokesman later clarified Stalder's statement, saying the reference to lost personnel was in regard to the entire wing.

Lowe and Cook were replaced by Lt. Col. Stephen Hall and Maj. Thomas Post, both of HMLA-169. The Corps didn't say who replaced the other three Marines.

"I did the best I could with the assets I had and the guidance that was given," Lowe said in a written response to questions from Marine Corps Times. "I have all of my aircraft and no one has been hurt on my watch. I have no regrets."

Cook could not be reached for comment.

New pressure on leaders

The rash of firings and reassignments is the first known example of squadron leaders paying such a stiff penalty for mistakes in their squadron -- an outgrowth of new and intense pressure on aviation leaders to stem the tide of deadly accidents and downed aircraft. In fiscal 2004, the worst for Marine aviation in 13 years, the Corps lost 19 aircraft and 15 Marines -- most during non-combat training flights. Lt. Gen. Mike Hough, the deputy commandant for aviation, vowed this summer to hold leadership accountable and called on his wing commanders to follow through.

But some aviators feel the unprecedented move to fire five squadron leaders smacks of overkill -- an overreaction to pressures from the commandant and his deputy for aviation. Some also wonder whether Stalder's housecleaning could chill other commanders' war-fighting zeal, spurring them to focus more on safety than on mission accomplishment.

But others say HMLA-367 was in a safety tailspin, that the leadership had not broken the trend and that wiping the slate clean was the only thing to do.

A question of timing

Among Marines, the squadron commander is responsible for everything that happens -- good or bad -- on his watch. And the five accidents HMLA-367 recorded over 11 months didn't reflect well on Lowe.

Two were Class A accidents, having caused more than $1 million in damages. Three were Class C accidents, having caused between $20,000 and $200,000 in damages.

But an examination of the accident records and statements from squadron members and the commander himself cast doubt on whether some of the accidents Stalder pinned on Lowe were Lowe's responsibility.

"I believe that there was some confusion in the numbers and severity of HMLA-367's mishap record during my command," Lowe wrote. "Did we have some opening day jitters? Sure."

Officials with 3rd MAW blame Lowe for the two Class A mishaps: the Oct. 22, 2003, crash of a UH-1N Huey at Marine Corps Air Ground Combat Center in Twentynine Palms, Calif.; and the Jan. 23 crash of an AH-1W Super Cobra at Marine Corps Air Station Yuma, Ariz.

Both aircraft were destroyed, but no Marines were injured. The Judge Advocate General manual investigation reports on each crash have not been released.

Though Stalder held Lowe responsible for these accidents, the 3rd MAW spokesman, Maj. Sean Clements, said neither could be directly tied to Lowe's command. The October crash occurred nearly a month before Lowe joined HMLA-367; he took command Nov. 20, 2003. And the January crash involved a Super Cobra from his squadron, but it was not flown by pilots under his command.

"However, since it was my aircraft, the accident is officially counted against the squadron," Lowe wrote.

Lowe deployed to Iraq with 345 personnel, but left his aircraft at home. Instead, the Marines of HMLA-367 flew the helicopters left there by a previous squadron, including 18 Super Cobras and nine Hueys.

The executive officer's accountability for the Class A accidents, too, is questionable. Cook moved to Camp Pendleton in August 2003 and joined
HMLA-367 after a brief round of Super Cobra refresher training. It wasn't clear what billet Cook held upon joining the squadron, but he didn't become XO until February, well after the two Class A mishaps.

The case for holding Lowe and Cook responsible for the Class C accidents is more clear cut, as all three happened after the two settled into their leadership posts.

But in his written response, Lowe stressed that two of the three came during the squadron's first month of combat operations after deploying to Iraq in mid-August.

One, which involved a Super Cobra, happened during a nighttime mission to support raids conducted by Marines in western Iraq. While checking on a malfunctioning generator box in the cockpit during the Sept. 10 mission, the Cobra pilot temporarily lost control of the aircraft and the helicopter's tail boom dipped, hitting the waters of the Euphrates River, according to squadron members who spoke on condition of anonymity.

The Super Cobra's tail rotor sustained minor damage and was ready for operations the next day, the squadron members said.

A little more than a week later, on Sept. 18, another of Lowe's Super Cobras drifted into a parked UH-60 Blackhawk helicopter while taking off after a nighttime refueling stop. The Super Cobra sustained only minor damage but one of the Blackhawk's rotor blades was damaged and had to be replaced.

"There are few things tougher than operating a helicopter on night-vision goggles and in a dusty desert environment," Lowe explained.
"I believe that this has been proven over and over in the past three years since Operation Enduring Freedom commenced."

The third Class C accident came before the squadron deployed; a Huey made a hard landing during a June 8 training flight at Camp Pendleton.
One of the Huey's skids was bent during the landing, but one squadron Marine said the accident might have been due to faulty metal rather than a hard landing.

Clements, the 3rd MAW spokesman, declined a request for further comment from wing leaders to address Lowe's remarks, or to answer questions regarding the dismissal of the squadron's senior staff and whether Lowe had been given any warning of his impending dismissal.

After the second accident in Iraq, Marine Aircraft Group 16 commander Col. Guy M. Close traveled to Camp Taqaddum, expressing concern about the two mishaps and telling the squadron to shape up, according to active-duty Marines familiar with the incident.

The crackdown begins

After a one day stand-down in which squadron leaders called for a renewed focus on safety, the squadron returned to its 24/7 pace of combat operations.

"I believe I was an excellent CO to HMLA-367 and I believe you will find that opinion throughout the squadron. I stand by every command decision I have made," Lowe wrote.

Records from the Naval Safety Center in Norfolk, Va., offer perspective on HMLA-367's safety record during fiscal 2004. Over the course of the year, the Corps suffered a total of 24 Class C accidents. Of those 24, eight involved Hueys or Super Cobras -- three of which were under Lowe's command.

At the same time, the Corps suffered 18 Class A mishaps involving 22 aircraft -- many of them during peacetime operations.

Hough, the Corps' aviation chief, launched the Corpswide aviation safety crackdown in August in reaction to the high number of accidents that occurred during routine training or "administrative" portions of flights, such as returning to base or flying to a range.

"We are killing more aircrew in training mishaps than during combat missions," Hough wrote late this summer in a message to his commanders.
"All aviation commands must support this effort to identify the hazards and implement the necessary controls to manage our risk so we can reverse this mishap trend."

In an Aug. 26 interview as Corps officials were rolling out details of the crackdown plan, Stalder vowed to hold his squadron commanders accountable for their accidents.

As he recounted the details of a December 2003 crash involving an AV-8B Harrier jet, which he attributed to pilot error stemming from "supervisory gaps," Stalder said he wouldn't stop at firing just a squadron commander.

"I told my commanders that if you do something like this, you're going to be gone, and probably some of the people who work for you are going to be gone.

"I did that ... to make them understand where I come from on the issue of accountability."

So far, Stalder is the first wing commander known to have made good on his promise to fire a squadron commander and his top staff for safety reasons.

In his Oct. 5 statement about the HMLA-367 firings, Stalder said the moves were intended to address a "trend" in the squadron that Lowe had failed to stop.

A tough decision

It is not clear whether the mass firing at HMLA-367 will have a chilling effect on other squadrons. Those who know Lowe say he was a top-notch pilot and that they were shocked to find out he was fired, voicing skepticism about the circumstances that led up to the firing.

"He is a very bright, very talented guy," said Maj. Clayton Bollinger, a Super Cobra pilot who served with Lowe in 1998. "When I heard he'd been fired, I was like 'whoa!'"

Meanwhile, others warn that firing or reassigning five squadron officials for a series of comparatively minor mishaps -- especially when two of them happened during the first few weeks of combat operations in a new environment -- could prompt other squadron commanders to focus more on safety than on supporting Marines in combat.

Although most didn't see the housecleaning coming, pilots in the community knew the hammer would drop on someone soon.

"It seems like they're trying to chop somebody's head off for the mishaps of the aviation community over the last two or three years,"
said 1st Lt. Jesse Hardin, a Cobra pilot with HMLA-367 who is now the officer in charge of the squadron's stateside detachment. Hardin flew in Iraq with HMLA-775 -- a Reserve unit that HMLA-367 replaced in August -- as an augmentee.

"Somebody's head was going to go on the chopping block and it was a matter of time."

Even veteran pilots see Stalder's move as drastic, especially his decision to fire not just the CO, but also the XO, while reassigning the operations officer, safety officer and maintenance chief.

Even though they grudgingly concede that Lowe should be held accountable for the record of the squadron, tossing out the others was over the top.

"Historically, you relieve the [commander] not because he did anything wrong but because you've lost confidence in him," said retired Col.

Barry Ford, a Cobra pilot who served with HMLA-367 during the 1991 Persian Gulf War. "But by relieving so many ... it seems to me to be a massive overkill."

"The only thing I can think of is it's to set an example."

Other veteran aviators spoke of the difficult decisions both squadron leaders and their superiors must make in combat zones.

"It's absolutely unfortunate for those involved, and my heart goes out to them," said retired Maj. Gen. William Whitlow, a former assistant wing commander.

Whitlow, a Huey pilot, said he understands commanders in the field face enormous challenges. But he also acknowledged that their senior commanders must hold them responsible if they don't agree with the choices made in the field.

"They operate in a very harsh and demanding environment and the commanders have to make very difficult and timely decisions that hold Marines' futures in their hands," Whitlow said.

"But it's up to the commanding general to make the decisions he has to make regardless of the type of environment they're operating in."

Whitlow added that he knows the senior commanders at 3rd MAW, including Stalder, to be "extremely competent, qualified and absolutely fair"
Marine officers.

Although Lowe expressed a strong desire that the firings remain discreet, he took full responsibility for his actions and said he understood the pressure Stalder has been under to turn around one of the worst years in Marine Corps aviation safety history.

"Am I disappointed? No. I am personally devastated," he wrote. "However, it is not what's best for me, it is what is best for the squadron. I wish the new commander well."

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

**BRADLEY L. LOWE**
**Plaintiff**

\*

\*

v.

\*

**CIVIL ACTION**
**NO.: 1:06-cv-01803-ESH**

\*

**DONALD C. WINTER**
**Secretary of the Navy**
**Department of the Navy**
**Defendant**

\*

\*

**DECLARATION OF**
**NANCY B. JONES**

\*    \*    \*

I, Nancy B. Jones, hereby declare under the penalty of perjury that the following is true

and correct:

1. I am a civilian, currently employed as the Staff Attorney for the Naval Safety Center (NSC) in

Norfolk, Virginia. I have been in this position since May 2007. Prior to my current position, I

was on active duty as a Navy Judge Advocate for 20 years and was assigned to the NSC as the

Staff Judge Advocate from 2000 to 2003.

2. The mission of the NSC is to provide safety assistance and advice to the Chief of Naval

Operations, the Commandant of the Marine Corps, and Deputy Assistant Secretary of the Navy

for Safety to enhance the warfighting capability of the Navy and Marine Corps by preventing

mishaps and saving lives to preserve resources and improve combat readiness. As part of that

mission, the NSC staff collects, stores and disseminates mishap information in accordance with

the Freedom of Information Act (FOIA), the Privacy Act and applicable Navy and Marine Corps

instructions.

3. The NSC is the sole release authority for the mishap data contained in safety investigation

reports and the internal databases derived from those reports. As the current Staff Attorney and

former Staff Judge Advocate at the NSC, I am familiar with how the NSC maintains its records

and the process by which information is released. NSC records that are retrieved in response to a FOIA request are queried by information specific to the mishap (date, location, platform, unit, and /or bureau number). Requested reports are not retrieved by any personal identifiers. Once a responsive record is located, it is thoroughly reviewed to insure the redaction of all information protected by the Safety Privilege, a FOIA exemption and/or the Privacy Act prior to releasing it to the requester. Occasionally, the NSC Public Affairs Officer will field a media request for information. Such requests are generally vetted through the Chief of Naval Information and involve nothing more than statistical data. Media requests involving anything more than that are referred over to the FOIA staff for processing.

4. I was asked by the Navy Litigation Office to search NSC records for any indication that information regarding Marine Corps aviation mishaps in 2004 was released to Christian Lowe for use in his story for the Marine Corps Times, or any evidence of a similar request under the FOIA. After a diligent search, I was unable to find a record of any release of information to, or a request under the FOIA by Christian Lowe. Specifically, the Public Affairs Office only maintains such records for two years, and therefore evidence of any request through that office would no longer exist. There is no record that Christian Lowe made a FOIA request during or near the time that his article was published.

Executed this 4th day of February 2008.


NANCY R. JONES

I declare under penalty of perjury that the foregoing answer to interrogatory 5 is true and correct based upon the information provided to me.

Executed on February 4, 2008

Nancy B. Jones
Staff Attorney
Naval Safety Center

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **BRADLEY L. LOWE** | * | |
| **Plaintiff** | | |
| | * | |
| **v.** | | **CIVIL ACTION** |
| | * | **NO.: 1:06-cv-01803-ESH** |
| **DONALD C. WINTER** | * | **DECLARATION OF** |
| **Secretary of the Navy** | | **COLONEL VAUGHN ARY,** |
| **Department of the Navy** | * | **USMC** |
| **Defendant** | | |

\* \* \*

I, Colonel Vaughn Ary, United States Marine Corps, hereby declare under the penalty of perjury that the following is true and correct:

1. I am the Staff Judge Advocate of the 3rd Marine Aircraft Wing ("MAW"), located in Miramar, California. I have personal knowledge of the matters set forth herein, and if called upon to testify, could and would competently testify thereto.

2. At the request of the Navy Litigation Office in January 2008, I requested that the command Freedom of Information Act ("FOIA") Officer search the command files for any FOIA requests regarding the removal of command of Lieutenant Colonel Bradley Lowe in October 2004 or for any aircraft incident investigations for Lieutenant Colonel Lowe's squadron, Marine Light Attack Helicopter Squadron 367. No such FOIA requests during 2004 were made.

3. Additionally, the command maintains no records related to Lieutenant Colonel Bradley Lowe's relief of command for cause.   In the Marine Corps, a relief of

1

command for cause is an informal process. It is sufficient to relieve a subordinate for cause if a Commanding Officer has a loss of trust and confidence in the subordinate. No documentation of the event is necessary.

4. While the 3rd MAW maintains records of accident reports involving commands under its cognizance for a period of three years in the Department of Safety Standardization (DOSS), these records are not retrievable by any personal identifier. Instead, they can be retrieved by command, date of accident, and type of aircraft involved.

Executed this 6th day of February 2008.

_VAUGHN ARY_

STATE OF HAWAII    }
                    } SS
CITY AND COUNTY OF HONOLULU    }

This 6 day of February, A.D. 2008, before me personally appeared Vaughn Ary To me known to be the person(s) described in and who executed the foregoing instrument and acknowledged that he/she/they executed the same as his/her/their free act and deed.

NOTARY PUBLIC, STATE OF HAWAII

August 19, 2011
MY COMMISSION EXPIRES.

ZACHARY A. MILLS
NOTARY PUBLIC
STATE OF HAWAII

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                       )
BRADLEY L. LOWE,                       )
                                       )
                                       )
          Plaintiff,                   )
                                       )     No. 1:06CV01803 (ESH)
          v.                           )     ECF
                                       )
DONALD C. WINTER,                      )
SECRETARY OF THE NAVY,                 )
                                       )
          Defendant.                   )
_____)

ORDER

UPON CONSIDERATION of federal defendant's Motion to Dismiss, or in the

Alternative, for Summary Judgment, and for good cause shown,

it is this _____ day of _____, 2008,

ORDERED, that federal defendant's motion should be, and it hereby is, granted.

IT IS FURTHER ORDERED, that the case is dismissed.


                                    _____
                                    UNITED STATES DISTRICT JUDGE